1 ·Andy D. Birchfield, Jr. (BIR006)
  Gerald B. Taylor, Jr. (TAY026)
2 Navan Ward, Jr. (WAR062)
  BEASLEY, ALLEN, CROW, METHVIN,
3 PORTIS & MILES, P.C.
  Post Office Box 4160
4 Montgomery, Alabama 36103-4160
  (334) 269-2343 telephone
5 (334) 954-7555 facsimile

6 Attorneys for Plaintiff

7

8                 UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                   (SAN FRANCISCO DIVISION)

11

12 CHAD JAMES FLYNN, individually and          Case No.  **C 07 3955**
   on behalf of RONALD JAMES FLYNN,
13 deceased,                                    **CIVIL COMPLAINT**

14        Plaintiff,

15 v.                                           **JURY TRIAL DEMANDED**

16 PFIZER INC., PHARMACIA
   CORPORATION, G.D. SEARLE, LLC, and
17 MONSANTO COMPANY,

18        Defendants.

19

20        Chad James Flynn, as Personal Representative of the Estate of Ronald James

21 Flynn, deceased ("Plaintiff"), through counsel and pursuant to applicable law and Minnesota

22 Wrongful Death Act, by and through his counsel, brings this action against Defendants PFIZER

23 INC., PHARMACIA CORPORATION, G.D. SEARLE LLC, and MONSANTO COMPANY

24 (hereafter collectively "Defendants") and alleges as follows:

25 **I.    PARTIES**

26        1.    This is an action for damages arising from Defendants' design,

27 manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe

28 medication Valdecoxib, trade name BEXTRA® ("BEXTRA").

1    .        .        2.        Plaintiff and decedent were at all relevant times adult resident citizens of

2    the State of Minnesota, and a resident of Douglas County. Plaintiff, Chad James Flynn, is the son

3    of the decedent, is the Personal Representative of the decedent's estate, is a resident of Minnesota

4    and is the proper party to bring this claim on behalf of the Estate and survivors of decedent.

5            3.        Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its

6    principal place of business in New York, New York.   In 2003, Pfizer acquired Pharmacia

7    Corporation for nearly $60 billion. At all relevant times Pfizer and/or its predecessors in interest

8    were engaged in the business of designing, testing, manufacturing, packaging, marketing,

9    distributing, promoting, and selling the drug Valdecoxib, under the trade name BEXTRA

10   nationwide.

11           4.        Defendant G. D. Searle, LLC, formerly known as G. D. Searle & Co.

12   ("Searle") is a Delaware corporation with its principal place of business in Illinois. At all relevant

13   times, Searle has been engaged in the business of marketing and selling BEXTRA nationwide.

14   Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this

15   Complaint.

16           5.        Defendant Pharmacia Corporation ("Pharmacia ") is a Delaware

17   corporation with its principal place of business in New Jersey.  At all relevant times, Pharmacia,

18   and its predecessors in interest have been engaged in the business of designing, testing,

19   manufacturing, packaging, marketing, distributing, promoting, and selling BEXTRA nationwide.

20           6.        Defendant Monsanto Company ("Monsanto") was the parent corporation

21   of Searle and is a Delaware corporation.  At all times relevant hereto, Monsanto, through its

22   subsidiary companies, was in the business of manufacturing, marketing, selling and distributing

23   the pharmaceutical product BEXTRA nationwide.

24   **II.    JURISDICTION AND VENUE**

25           7.        This is an action for damages, which exceeds seventy-five thousand dollars

26   ($75,000.00).

27           8.        There is complete diversity of citizenship between the Plaintiff and

28   Defendants.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A.

1 ·§ 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and

2 because there is complete diversity of citizenship between Plaintiff and Defendants.

3        9.    Venue is proper in this United States Judicial District pursuant to

4 28 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in

5 the district, thereby receiving substantial financial benefit and profits the dangerous product in

6 this district, and reside in this district under 28 U.S.C.A. § 1391(c), such that venue is proper.

7        10.    At all relevant times herein, Defendants were in the business of designing,

8 manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and

9 selling their product, CELEBREX. Defendants at all times relevant hereto designed, developed,

10 manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce

11 the aforementioned prescription drug. Defendants do substantial business Nationwide and within

12 this District, advertise in this district, receive substantial compensation and profits from sales of

13 CELEBREX in this District, and made material omissions and misrepresentations and breaches of

14 warranties in this District so as to subject them to *in personam* jurisdiction in this District. In

15 engaging in the conduct alleged herein, each Defendant acted as the agent for each of the other

16 Defendants or those Defendant's predecessors in interest.

17 **III.   INTERDISTRICT ASSIGNMENT**

18        11.    Assignment to the San Francisco Division is proper as this action is related

19 to *In Re: Bextra and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to

20 the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,

21 2005.

22 **IV.   FACTUAL BACKGROUND**

23        **A.    Facts Regarding Plaintiff**

24        12.    Decedent was prescribed, and began taking, BEXTRA for pain.

25        13.    As a direct and proximate result of using BEXTRA, Decedent suffered

26 severe cardiovascular injuries. Specifically, on August 9, 2004, Decedent suffered an acute

27 myocardial infarction ("heart attack"), which has caused death.

28

1    14.    Decedent and Decedent's healthcare providers were at the time of

2  Decedent's heart attack and initial injury unaware—and could not have reasonably known or have

3  learned through reasonable diligence—that such injury directly resulted from Defendants'

4  negligent and otherwise culpable acts, omissions, and misrepresentations or from Decedent's

5  ingestion of BEXTRA.

6    15.    Decedent used BEXTRA in a proper and reasonably foreseeable manner

7  and used it in a condition that was substantially the same as the condition in which it was

8  manufactured and sold.

9    16.    Decedent would not have used BEXTRA had Defendants properly

10  disclosed the risks associated with the drug.

11    **B.    Facts Regarding Bextra and Bextra's Market Launch**

12    17.    Bextra is one of a class of pain medications called non-steroidal anti-

13  inflammatory drugs ("NSAIDs").  Aspirin, naproxen (trade name Aleve), and ibuprofen (trade

14  name Advil) are examples of well-known NSAIDs.

15    18.    NSAIDs reduce pain by blocking the body's production of pain

16  transmission enzymes called cyclo-oxygenase or "COX."    There are two forms of COX

17  enzymes—COX-1 and COX-2.  Aspirin, naproxen and ibuprofen all act by blocking COX-1 and

18  COX-2 enzymes.

19    19.    In addition to decreasing inflammation, the prostaglandins that are

20  supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the

21  stomach wall from the hydrochloric acid present in the stomach.  It is generally accepted in the

22  medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric

23  tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including

24  stomach ulceration and bleeding.

25    20.    Prostaglandin I2 is the predominant cyclooxygenase product in

26  endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation,

27  and preventing the proliferation of vascular smooth muscle.  Whereas older NSAIDS inhibit

28  Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected.

- 4 -

1    .Thromboxane A2 is a potent platelet aggregator and vasoconstrictor, which is synthesized by

2    platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction,

3    the COX-2 inhibitors support it.

4         21.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore

5    pain by inhibiting both COX-1 and COX-2 enzymes simultaneously.   As would be expected,

6    traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause

7    blood clots, rather they actually reduce the risk of clots and help protect heart function.

8         22.    Defendants and other pharmaceutical companies set out to remedy these

9    ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors

10   that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of

11   gastric tissue while still reducing inflammation.

12        23.    In making this decision, Defendants and their predecessors in interest either

13   intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2

14   inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood

15   clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,

16   unstable angina. The vasoconstriction and fluid retention cause the hypertension.

17        24.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor

18   drugs, in early 1999 and initiated a massive marketing campaign to convince doctors and

19   consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs.  In

20   May 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

21        25.    Seeking increased market share in this extremely lucrative market,

22   Defendants, and their predecessors in interest, also sought approval of a "second generation"

23   selective COX-2 inhibitor and filed for FDA approval of Bextra on January 16, 2001 for the

24   (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief

25   of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

26        26.    The FDA granted approval of the new drug on November 16, 2001, for two

27   particular uses:  (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

28   of osteoarthritis and rheumatoid arthritis.

27.     The FDA did not grant approval to market and promote Bextra for the management or prevention of acute pain.

28.     The FDA did not grant approval to promote Bextra as more effective than other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or gastric bleeding.

29.     Even without a label that allowed Defendants to legitimately claim superior safety, when Defendants, and their predecessors-in-interest, began marketing Bextra in early 2002, Defendants and their representatives and agents misrepresented the safety profile of Bextra to consumers, including Plaintiff, the medical community, healthcare providers, and third party payers. Defendants proceeded to promote, market, sell, and distribute Bextra as a much safer and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

**C.      Facts Regarding Bextra's Safety and Defendants' Knowledge Thereof.**

30.     The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants long before the FDA granted market approval in November 2, 2001. By 1997, and prior to the submission of the New Drug Application (the "NDA") for Bextra, Defendants was aware that, by inhibiting COX-2, Bextra altered the homeostatic balance between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954.   Although all COX-2 inhibitors have this mechanism of action, Bextra was the most selective COX-2 inhibitor proposed for approval. Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

31.     As Pharmacologist, Dr. Garrett Fitzgerald, of the University of Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as Bextra, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

1   32.   Nevertheless, on January 16, 2001, Defendants submitted an NDA to the

2   FDA for Bextra, omitting information about the extent of the risks associated with Bextra.

3   Without a complete picture of the potential hazards associated with the drug, the FDA approved

4   Bextra on or about November 16, 2001.

5   33.   Based on the studies performed on Celebrex, Vioxx, Bextra, and other

6   COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely

7   conducted, Defendants knew when Bextra was being developed and tested that selective COX-2

8   inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific

9   additional threat to anyone with existing heart disease or cardiovascular risk factors.  Studies

10  show that selective COX-2 inhibitors, including Bextra, decrease blood levels of a prostacyclin.

11  When those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart

12  attack, and stroke.

13  34.   On December 9, 2004, the FDA issued new information on side effects

14  associated with the use of Bextra and required the addition of certain warnings to, and the

15  strengthening of other warnings on, the Bextra label.  The enhanced warnings followed in the

16  wake of the results of additional cardiovascular studies performed by Defendants, as well as

17  numerous complaints to the FDA regarding severe skin reactions.

18  35.   Yet well prior to this warning, Defendants had knowledge of the coronary

19  and cardiovascular safety risks of Bextra from several studies. *See e.g.*, Otto, E.O., *Efficacy and*

20  *Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing*

21  *Coronary Artery Bypass Surgery*, *The Journal of Thoracic and Cardiovascular Surgery*, June

22  2003 at 1481.

23  36.   Even Defendants' own (and Pfizer funded) post- drug approval meta-

24  analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data

25  showing an increased cardiovascular risk in patients treated with Bextra after undergoing

26  coronary artery bypass graft surgery.  Observed events included heart attack, stroke, and blood

27  clots in the legs and lungs.  The results were particularly relevant and striking as each of the study

28

COMPLAINT

1    participants who were a post-bypass surgery patient was taking anti-clotting agents at the time
2    their exposure to Bextra was being tracked.

3         37.    In mid-January 2005, a peer-reviewed paper from the University of
4    Pennsylvania found that in patients having heart bypass surgery, those who took Bextra in the
5    intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a
6    heart attack or stroke.

7         38.    From February 16-18, 2005, the FDA's Drug Safety and Risk Management
8    Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine
9    the safety of COX-2 inhibitors.  There, FDA Office of Drug Safety Officer David Graham
10   testified that selective COX-2 inhibitors increase the risk for adverse cardiovascular events at
11   about the same rate as cigarette smoking, hypertension, and diabetes.

12        39.    Despite years of studies on selective COX-2 inhibitors, as well as the
13   disturbing new studies specifically analyzing the risks of Bextra, Defendants failed to take any
14   action to protect the health and welfare of patients, but instead, continued to promote the drug for
15   sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis
16   Drug Advisory Committee meetings.

17        40.    On April 7, 2005, the FDA finally insisted that Defendants "voluntarily
18   withdraw" Bextra from the U.S. market, stating:

19            ". . . the Agency has concluded that the overall risk versus benefit
             profile of Bextra is unfavorable.  This conclusion is based on the
20           potential increased risk for serious cardiovascular (CV) adverse
             events, which appears to be a class effect of non-steroidal anti-
21           inflammatory drugs (NSAIDs) (excluding aspirin), an increased
             risk of serious skin reactions (e.g. toxic epidermal necrolysis,
22           Stevens-Johnson syndrome, erythema multiforme) compared to
             other NSAIDs, and the fact that Bextra has not been shown to offer
23           any unique advantage over the other available NSAIDs."

24        41.    FDA Alert for Healthcare Professionals, April 7, 2005.

25   Continuing, the FDA noted:

26            "Bextra has been demonstrated to be associated with an
             increased risk of serious adverse CV events in two short-term trials
27           in patients immediately post-operative from coronary artery bypass
             graft (CABG) surgery . . . .  FDA has concluded that it is reasonable
28           to extrapolate the adverse CV risk information for Bextra from the

                                    - 8 -                              COMPLAINT

1

2

3

4

5

6

> short-term CABG trials to chronic use given the fact that other
> COX-2 selective NSAIDs have been shown in long-term controlled
> clinical trials to be associated with an increased risk of serious
> adverse CV events (e.g., death, MI, stroke), and the well described
> risk of serious, and often life-threatening gastrointestinal
> bleeding . . . . To date, there have been no studies that demonstrate
> an advantage of Bextra over other NSAIDs that might offset the
> concern about the[] serous skin risks, such as studies that show a GI
> safety benefit, better efficacy compared to other products, or
> efficacy in a setting of patients who are refractory to treatment with
> other products."

7      42.    The scientific data available during and after Bextra's approval process

8  made clear to Defendants that their formulation of Bextra would cause a higher risk of blood

9  clots, stroke and/or myocardial infarctions among Bextra consumers, alerting them to the need to

10  do additional and adequate safety studies.

11      43.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal*

12  *of Medicine*, outlining Defendants' failure to have conducted the necessary trials before

13  marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular

14  risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with

15  established coronary artery disease, who frequently have coexisting osteoarthritis requiring

16  medication and have the highest risk of further cardiovascular events."

17      44.    Dr. Topol was also the author on the study published in August 2001 in

18  JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in

19  persons who used COX-2 inhibitors.

20      45.    Based upon readily available scientific data, Defendants knew, or should

21  have known, that their pre-approval testing of Bextra did not adequately represent the cross-

22  section of individuals who were intended consumers and therefore, likely to take Bextra.

23  Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for

24  Bextra (noting that: "**Platelets**: In four clinical studies with young and elderly (>/=65 years)

25  subjects, single and multiple doses up to 7 day mg BID had no effect on platelet aggregation").

26      46.    Had Defendants done adequate testing prior to approval and "market

27  launch," rather than the extremely short duration studies done on the small size patient base that

28  was actually done) Pharmacia and Searle's scientific data would have revealed significant

- 9 -

increases in incidence of strokes and myocardial infarctions among the intended and targeted population of Bextra consumers.  Adequate testing would have shown that Bextra possessed serious side effects for individuals such as Plaintiff.  Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

47.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but this information was intentionally suppressed by Defendants in order for them to gain significant profits from continued Bextra sales.

48.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

49.    At the time Defendants manufactured, advertised, and distributed Bextra to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers such as Plaintiff would not purchase Bextra, but instead would purchase other cheaper and safer NSAIDs.

### D.    Facts Regarding Defendants' Marketing and Sale of Bextra

50.    Plaintiff and at all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive Bextra as a safer and better drug than its other NSAIDs and, therefore, purchase Bextra.

51.    Defendants widely and successfully marketed Bextra throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of Bextra in order to induce a widespread use and consumption.  Bextra was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.  Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physicians.

1    52.    Despite knowledge of the dangers presented by Bextra, Defendants and

2    Defendants' predecessors in interest, through their officers, directors and managing agents for the

3    purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy

4    the known defects of Defendants' product, Bextra, and failed to warn the public, including

5    Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product,

6    Bextra.   Defendants and their officers, agents and managers intentionally proceeded with the

7    inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,

8    Bextra, knowing that persons would be exposed to serious potential danger, in order to advance

9    their own pecuniary interests.   Defendants' conduct was wanton and willful, and displayed a

10   conscious disregard for the safety of the public and particularly of Plaintiff.

11   53.    In an elaborate and sophisticated manner, Defendants aggressively

12   marketed Bextra directly to consumers and medical professionals (including physicians and

13   leading medical scholars) in order to leverage pressure on third party payers, medical care

14   organizations, and large institutional buyers (*e.g.*, hospitals) to include Bextra on their

15   formularies.   Faced with the increased demand for the drug by consumers and health care

16   professionals that resulted from Defendants' successful advertising and marketing blitz, third

17   party payers were compelled to add Bextra to their formularies. Defendants' marketing campaign

18   specifically targeted third party payers, physicians, and consumers, and was designed to convince

19   them of both the therapeutic and economic value of Bextra.

20   54.    Defendants represented that Bextra was similar to ibuprofen and naproxen

21   but was superior because it lacked any of the common gastrointestinal adverse side effects

22   associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance,

23   NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with

24   long-term use.  Defendants promoted Bextra as a safe and effective alternative that would not

25   have the same deleterious and painful impact on the gut, but that would be just as effective, if not

26   more so, for pain relief.

27   55.    Bextra possessed dangerous and concealed or undisclosed side effects,

28   including the increased risk of serious cardiovascular events, such as heart attacks, unstable

1  angina; cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as

2  strokes. In addition, Bextra was no more effective than traditional and less expensive NSAIDs

3  and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal

4  bleeding. Defendants chose not to warn about these risks and dangers.

5          56.     Defendants knew of these risks before the U.S. Food and Drug

6  Administration (the "FDA") approved Bextra for sale on November 16, 2001, but Defendants

7  ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied

8  inefficacy in its promotion, advertising, marketing, and sale of Bextra. Defendants' omission,

9  suppression, and concealment of this important information enabled Bextra to be sold to, and

10 purchased, or paid for by, the Consumers at a grossly inflated price.

11         57.     Consequently, Bextra captured a large market share of anti-inflammatory

12 drugs prescribed for and used by patients. In 2002 alone (after a drug launch in March of 2002),

13 sales of Bextra exceeded $1.5 billion, despite the significantly higher cost of Bextra as compared

14 to other pain relievers in the same family of drugs.

15         58.     It was not until April 7, 2005, that Defendants finally acknowledged

16 Bextra's deleterious side effects and announced that they were withdrawing the drug from the

17 worldwide market based on what it misleadingly termed "new" and "unexpected" evidence

18 linking Bextra to an increased risk of heart attacks and strokes.

19         59.     Had Defendants done adequate testing prior to approval and "market

20 launch," Pharmacia's scientific data would have revealed significant increases in stroke and

21 myocardial infarction amongst the intended population of BEXTRA consumers.  Adequate

22 testing would have shown that BEXTRA possessed serious side effects. Defendants should have

23 taken appropriate measures to ensure that their defectively designed product would not be placed

24 in the stream of commerce and/or should have provided full and proper warnings accurately and

25 fully reflecting the scope and severity of symptoms of those side effects should have been made.

26         60.     In fact, post-market approval data did reveal increased risks of clotting,

27 stroke and myocardial infarction, but this information was intentionally suppressed by Defendants

28 in order for them to gain significant profits from continued BEXTRA sales.

COMPLAINT

61. Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

62. At the time Defendants manufactured, advertising, and distributed BEXTRA to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers such as plaintiff would not purchase BEXTRA, but instead would purchase other cheaper and safer NSAID drugs.

63. At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers, including plaintiff, and their doctors would perceive BEXTRA as a better drug than its competitors and, therefore, purchase BEXTRA.

64. Defendants widely and successfully marketed BEXTRA throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of BEXTRA in order to induce a widespread use and consumption. BEXTRA was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physicians.

65. Prior to manufacturing, sale and distribution of BEXTRA, Defendants, through their officers, director and managing agents, had notice and knowledge from several sources, that BEXTRA presented substantial and unreasonable risks of harm to the consumer. As such, BEXTRA consumers, including Plaintiff, were unreasonably subject to risk of injury or death from the consumption of Defendants' product, BEXTRA.

Despite such knowledge, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product, BEXTRA, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product, BEXTRA. Defendants and their

officers, agents and managers intentionally proceeded with the inadequate testing, and then the manufacturing, sale and marketing of Defendants' product, BEXTRA, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
#### Negligence

66.     Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

67.     Defendants owed Decedent a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling BEXTRA.  This duty included the duty not to introduce a pharmaceutical drug, such as BEXTRA, into the stream of commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

68.     At all relevant times to this action, Defendants owed a duty to properly warn Decedent and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug BEXTRA.

69.     Defendants breached their duties by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of BEXTRA, including:

a.     failing to use due care in the preparation and development of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

b.     failing to use due care in the design of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

c.     failing to conduct adequate pre-clinical testing and research to determine the safety of BEXTRA;

1    d.    failing to conduct adequate post-marketing surveillance and
2    exposure studies to determine the safety of BEXTRA;

3    e.    failing to completely, accurately and in a timely fashion, disclose
4    the results of the pre-marketing testing and post-marketing surveillance and testing to Decedent,
5    consumers, the medical community, and the FDA;

6    f.    failing to accompany BEXTRA with proper warnings regarding all
7    possible adverse side effects associated with the use of BEXTRA;

8    g.    failing to use due care in the manufacture, inspection, and labeling
9    of BEXTRA to prevent the aforementioned risk of injuries to individuals who used BEXTRA;

10    h.    failing to use due care in the promotion of BEXTRA to prevent the
11    aforementioned risk of injuries to individuals when the drugs were ingested;

12    i.    failing to use due care in the sale and marketing of BEXTRA to
13    prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

14    j.    failing to use due care in the selling of BEXTRA to prevent the
15    aforementioned risk of injuries to individuals when the drugs were ingested;

16    k.    failing to provide adequate and accurate training and information to
17    the sales representatives who sold BEXTRA;

18    l.    failing to provide adequate and accurate training and information to
19    healthcare providers for the appropriate use of BEXTRA; and

20    m.    being otherwise reckless, careless and/or negligent.

21    70.    Despite the fact that Defendants knew or should have known that
22    BEXTRA caused unreasonable and dangerous side effects which many users would be unable to
23    remedy by any means, Defendants continued to promote and market BEXTRA to consumers,
24    including Decedent, when safer and more effective methods of pain relief were available.

25    71.    Defendants were, or should have been, had they exercised reasonable care,
26    in possession of evidence demonstrating that BEXTRA caused serious side effects. Nevertheless,
27    they continued to market their products by providing false and misleading information with
28    regard to the safety and efficacy of BEXTRA.

72.     Defendants knew or should have known that consumers such as Decedent would foreseeably suffer injury as a result of their failure to exercise ordinary care as described above.

73.     As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff and her family suffered loss of support and services and endured mental pain and suffering and loss of consortium of the Decedent.  The losses are permanent and continuing in nature.  In addition, the estate suffered a loss of net accumulations due to the premature death of Decedent, and the personal representative incurred medical and funeral expenses for the burial and funeral services of the decedent.  Decedent sustained serious cardiovascular injuries and death.  Decedent required healthcare and services incurring direct medical losses and costs including care for hospitalization, physician care, monitoring, treatment, medications, and supplies.

74.     Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

75.     WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF:
### Strict Liability

76.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleged as follows:

77.     At all times relevant to this action, Defendants were suppliers of BEXTRA, placing the drug into the stream of commerce.  BEXTRA was expected to and did reach Decedent without substantial change in the condition in which it was manufactured and sold.

78.     BEXTRA was unsafe for normal or reasonably anticipated use.

1    79.    BEXTRA was defective in design or formulation because when it left the

2 hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous

3 than an ordinary consumer would expect.    BEXTRA was also defective and unreasonably

4 dangerous in that the foreseeable risk of injuries from BEXTRA exceeded the benefits associated

5 with the design and/or formulation of the product.

6    80.    Bextra is unreasonably dangerous: a) in construction or composition as

7 provided in R.S. 9:2800.55; b) in design as provided in R.S. 9:2800.56; c) because an adequate

8 warning about the product was not provided as required by R.S. 9:2800.57; d) because it does not

9 conform to an express warranty of the manufacturer about the product as provided in R.S.

10 9:2800.58.

11    81.    The characteristics of Bextra that render it unreasonably dangerous under

12 R.S. 9:2800.55, et seq., existed at the time the product left the control of the manufacturer or

13 resulted from a reasonably anticipated alteration or modification of the product.

14    82.    The BEXTRA manufactured and supplied by Defendants was also

15 defective due to inadequate warnings, and/or inadequate clinical trials, testing and study, and

16 inadequate reporting regarding the results of the clinical trials, testing and study.  Defendants

17 failed to perform adequate testing before exposing Decedent to the medication, testing which

18 would have shown that BEXTRA had the potential to cause serious side effects including strokes

19 like that which affected Decedent.

20    83.    The BEXTRA manufactured and supplied by Defendants was defective

21 due to inadequate post-marketing warnings or instructions because, after Defendants knew or

22 should have known of the risk of injuries from BEXTRA, they failed to provide adequate

23 warnings to the medical community and the consumers, to whom they were directly marketing

24 and advertising BEXTRA; and, further, it continued to affirmatively promote BEXTRA as safe

25 and effective.

26    84.    BEXTRA was manufactured, distributed, tested, sold, marketed, advertised

27 and promoted defectively by Defendants, and as a direct and proximate cause of Defendants'

28

COMPLAINT

1    defective design of BEXTRA, Decedent used BEXTRA rather than other safer and cheaper
2    NSAIDs. As a result, Decedent suffered the personal injuries described above.

3            85.    Information given by Defendants to the medical community and to the
4    consumers concerning the safety and efficacy of BEXTRA, especially the information contained
5    in the advertising and promotional materials, did not accurately reflect the potential side effects of
6    BEXTRA.

7            86.    Had adequate warnings and instructions been provided, Decedent would
8    not have taken BEXTRA as he did, and would not have been at risk of the harmful side effects
9    described herein.

10           87.    Defendants acted with conscious and deliberate disregard of the
11   foreseeable harm caused by BEXTRA.

12           88.    Decedent could not, through the exercise of reasonable care, have
13   discovered BEXTRA's defects or perceived the dangers posed by the drug.

14           89.    As a direct and proximate consequence of Defendants' acts, omissions, and
15   misrepresentations described herein, the Plaintiff and her family suffered loss of support and
16   services and endured mental pain and suffering and loss of consortium of the Decedent. The
17   losses are permanent and continuing in nature. In addition, the estate suffered a loss of net
18   accumulations due to the premature death of Decedent, and the personal representative incurred
19   medical and funeral expenses for the burial and funeral services of the decedent. Decedent
20   sustained serious cardiovascular injuries and death. Decedent required healthcare and services
21   incurring direct medical losses and costs including care for hospitalization, physician care,
22   monitoring, treatment, medications, and supplies.

23           90.    Defendants' conduct was committed with knowing, conscious, wanton,
24   willful, and deliberate disregard for the value of human life and the rights and safety of
25   consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so
26   as to punish Defendants and deter them from similar conduct in the future.

27
28

COMPLAINT

91.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF:
### Breach of Express Warranty

92.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

93.    Defendants expressly represented to Decedent and other consumers and the medical community that BEXTRA was safe and fit for its intended purposes, that it was of merchantable quality, that it did not produce any dangerous side effects, particularly any unwarned-of side effects, and that it was adequately tested.

94.    These warranties came in the form of:

a.    Defendants' public written and verbal assurances of the safety and efficacy of BEXTRA;

b.    Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for BEXTRA, which failed to warn of the risk of injuries inherent to the ingestion of BEXTRA, especially to the long-term ingestion of BEXTRA;

c.    Verbal and written assurances made by Defendants regarding BEXTRA and downplaying the risk of injuries associated with the drug;

d.    False and misleading written information, supplied by Defendants, and published in the Physician's Desk Reference on an annual basis, upon which physicians relied in prescribing BEXTRA during the period of Decedent's ingestion of BEXTRA, and;

e.    advertisements.

95.    The documents referred to above were created by and at the direction of Defendants.

COMPLAINT

96.     Defendants knew or had reason to know that BEXTRA did not conform to these express representations in that BEXTRA is neither as safe nor as effective as represented, and that BEXTRA produces serious adverse side effects.

97.     BEXTRA did not and does not conform to Defendants' express representations because it is not safe, has numerous and serious side effects, including unwarned-of side effects, and causes severe and permanent injuries.

98.     Decedent, other consumers, and the medical community relied upon Defendants' express warranties.

99.     As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff and her family suffered loss of support and services and endured mental pain and suffering and loss of consortium of the Decedent. The losses are permanent and continuing in nature. In addition, the estate suffered a loss of net accumulations due to the premature death of Decedent, and the personal representative incurred medical and funeral expenses for the burial and funeral services of the decedent. Decedent sustained serious cardiovascular injuries and death. Decedent required healthcare and services incurring direct medical losses and costs including care for hospitalization, physician care, monitoring, treatment, medications, and supplies.

100.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

101.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF:
### Breach of Implied Warranty

102.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

1    103.    Defendants manufactured, distributed, advertised, promoted, and sold
2    BEXTRA.

3    104.    At all relevant times, Defendants knew of the use for which BEXTRA was
4    intended and impliedly warranted the product to be of merchantable quality and safe and fit for
5    such use.

6    105.    Defendants were aware that consumers, including Decedent, would use
7    BEXTRA for treatment of pain and inflammation and for other purposes.

8    106.    Decedent and the medical community reasonably relied upon Defendants'
9    judgment and expertise to only sell them or allow them to prescribe BEXTRA only if it was
10   indeed of merchantable quality and safe and fit for its intended use.  Consumers, including
11   Decedent, and the medical community, reasonably relied upon Defendants' implied warranty for
12   BEXTRA.

13   107.    BEXTRA reached consumers, including Decedent, without substantial
14   change in the condition in which it was manufactured and sold by Defendants.

15   108.    Defendants breached their implied warranty to consumers, including
16   Decedent; BEXTRA was not of merchantable quality or safe and fit for its intended use.

17   109.    As a direct and proximate consequence of Defendants' acts, omissions, and
18   misrepresentations described herein, the Plaintiff and her family suffered loss of support and
19   services and endured mental pain and suffering and loss of consortium of the Decedent.  The
20   losses are permanent and continuing in nature.  In addition, the estate suffered a loss of net
21   accumulations due to the premature death of Decedent, and the personal representative incurred
22   medical and funeral expenses for the burial and funeral services of the decedent.  Decedent
23   sustained serious cardiovascular injuries and death.  Decedent required healthcare and services
24   incurring direct medical losses and costs including care for hospitalization, physician care,
25   monitoring, treatment, medications, and supplies.

26   110.    Defendants' conduct was committed with knowing, conscious, wanton,
27   willful, and deliberate disregard for the value of human life and the rights and safety of
28

COMPLAINT

1    consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so

2    as to punish Defendants and deter them from similar conduct in the future.

3        111.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

4    compensatory damages and punitive and exemplary damages together with interest, the costs of

5    suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

6

7        ### FIFTH CLAIM FOR RELIEF:
        ### Fraudulent Misrepresentation & Concealment

8        112.    Plaintiff incorporates by reference all of the paragraphs of this Complaint

9    as if fully set forth herein.

10       113.    Defendants' superior knowledge and expertise, their relationship of trust

11   and confidence with doctors and the public, their specific knowledge regarding the risks and

12   dangers of BEXTRA, and their intentional dissemination of promotional and marketing

13   information about BEXTRA for the purpose of maximizing its sales, each gave rise to the

14   affirmative duty to meaningfully disclose and provide all material information about BEXTRA's

15   risks and harms to doctors and consumers.

16       114.    Defendants made fraudulent affirmative misrepresentations with respect to

17   BEXTRA in the following particulars:

18           a.    Defendants    represented    through    their    labeling,    advertising,

19   marketing materials, detail persons, seminar presentations, publications, notice letters, and

20   regulatory submissions that BEXTRA had been tested and found to be safe and effective for the

21   treatment of pain and inflammation; and

22           b.    Defendants represented that BEXTRA was safer than other

23   alternative medications.

24       115.    Defendants    made    affirmative    misrepresentations;    and    fraudulently,

25   intentionally and/or recklessly concealed material adverse information regarding the safety and

26   effectiveness of BEXTRA.

27       116.    Defendants made these misrepresentations and actively concealed adverse

28   information at a time when Defendants knew or had reason to know that BEXTRA had defects

- 22 -                                    COMPLAINT

1 · and was unreasonably dangerous and was not what Defendants had represented to the medical

2 community, the FDA and the consuming public, including Decedent.

3         117.   Defendants omitted, suppressed and/or concealed material facts concerning

4 the dangers and risk of injuries associated with the use of BEXTRA including, but not limited to,

5 the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'

6 purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the

7 serious nature of the risks associated with the use of BEXTRA in order to increase its sales.

8         118.   The representations and concealment were undertaken by Defendants with

9 an intent that doctors and patients, including Decedent, rely upon them.

10         119.   Defendants' representations and concealments were undertaken with the

11 intent of defrauding and deceiving Decedent, other consumers, and the medical community to

12 induce and encourage the sale of BEXTRA.

13         120.   Defendants' fraudulent representations evinced their callous, reckless,

14 willful, and depraved indifference to the health, safety, and welfare of consumers, including

15 Decedent.

16         121.   Decedent's physician and Decedent relied on and were induced by

17 Defendants' misrepresentations, omissions, and/or active concealment of the dangers of

18 BEXTRA in selecting BEXTRA treatment.

19         122.   Decedent and the treating medical community did not know that the

20 representations were false and were justified in relying upon Defendants' representations.

21         123.   Had Decedent been aware of the increased risk of side effects associated

22 with BEXTRA and the relative efficacy of BEXTRA compared with other readily available

23 medications, Decedent would not have taken BEXTRA as he did.

24         124.   As a direct and proximate consequence of Defendants' acts, omissions, and

25 misrepresentations described herein, the Plaintiff and her family suffered loss of support and

26 services and endured mental pain and suffering and loss of consortium of the Decedent. The

27 losses are permanent and continuing in nature. In addition, the estate suffered a loss of net

28 accumulations due to the premature death of Decedent, and the personal representative incurred

                                           COMPLAINT

1    medical and funeral expenses for the burial and funeral services of the decedent.    Decedent

2    sustained serious cardiovascular injuries and death.    Decedent required healthcare and services

3    incurring direct medical losses and costs including care for hospitalization, physician care,

4    monitoring, treatment, medications, and supplies.

5         125.    Defendants' conduct was committed with knowing, conscious, wanton,

6    willful, and deliberate disregard for the value of human life and the rights and safety of

7    consumers, including Decedent, thereby entitling Plaintiff to punitive and exemplary damages so

8    as to punish Defendants and deter them from similar conduct in the future.

9         126.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

10    compensatory damages, and punitive and exemplary damages together with interest, the costs of

11    suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

12

13    **SIXTH CLAIM FOR RELIEF**
     **(Unjust Enrichment)**

14         127.    Plaintiff incorporates by reference all previous paragraphs of this

15    Complaint as if fully set forth herein.

16         128.    At all times relevant to this action, Defendants were the manufacturers,

17    sellers, and/or suppliers of BEXTRA.

18         129.    Decedent paid for BEXTRA for the purpose of managing her pain safely

19    and effectively.

20         130.    Defendants have accepted payment from Decedent for the purchase of

21    BEXTRA.

22         131.    Decedent did not received the safe and effective pharmaceutical product

23    for which she paid.

24         132.    It is inequitable and unjust for Defendants to retain this money because the

25    Decedent did not in fact receive the product Defendant represented BEXTRA to be.

26         133.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

27    equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court

28    deems just and proper.

COMPLAINT

1

## SEVENTH CLAIM FOR RELIEF
### (Wrongful Death)

2

3

134.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

4

5

135.    As a direct and proximate result of the conduct of Defendants. the breach of implied and expressed warranties, the fraudulent misrepresentations, and/or the defective nature of BEXTRA, as more specifically described herein, Decedent suffered bodily injury and harm, resulting in pain and anguish, and ultimately death.  Decedent, and/or those on his behalf, also incurred significant hospital and medical expenses, funeral and administration expenses, loss of earning capacity, shortened life expectancy, and loss of enjoyment of life.  Decedent's loved ones also lost the love and affection of having the Decedent in their lives.

6

7

8

9

10

11

136.    In addition to those other damages detailed above, Plaintiff, for and on behalf of himself, Decedent, his estate and heirs, and others, seeks recovery of all pecuniary and compensatory damages permitted by law which have been incurred or lost as a result of Decedent's death.

12

13

14

15

137.    Defendants' conduct rose to the level of conscious, wanton, reckless, and intentional disregard for the rights and safety of others, including Decedent.

16

17

138.    WHEREFORE, Plaintiff, for an on behalf of Decedent,  demands judgment against Defendants and seeks compensatory damages and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

18

19

20

21

## PRAYER FOR RELIEF

22

WHEREFORE, Plaintiff requests the following relief:

23

1.    General damages in excess of the jurisdictional amount of this Court;

24

2.    Consequential damages;

25

3.    Disgorgement of profits;

26

4.    Restitution;

27

5.    Punitive and exemplary damages;

28

- 25 -                                                      COMPLAINT

'1         6.     Wrongful death damages;

2         7.     Pre-judgment and post-judgment interest as provided by law;

3         8.     Lost of consortium;

4         9.     Recovery of Decedent's costs including, but not limited to, discretionary Court costs of these causes, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action; and

7         10.     Such other and further relief as the Court deems just and proper.

Dated: July 30 , 2007        Respectfully submitted,

By: _____
    Andy D. Birchfield, Jr. (BIR006)
    Gerald B. Taylor, Jr. (TAY026)
    Navan Ward, Jr. (WAR062)
    BEASLEY, ALLEN, CROW, METHVIN,
    PORTIS & MILES, P.C.
    P. O. Box 4160
    Montgomery, Alabama 36103-4160
    Telephone: (334) 269-2343
    Facsimile: (334) 954-7555

        ATTORNEYS FOR PLAINTIFF

1        **DEMAND FOR JURY TRIAL**

2        Plaintiff demands a trial by jury on all claims so triable in this action.

3

4    Dated: July ___, 2007            By: _____
                                          Andy D. Birchfield, Jr. (BIR006)
5                                         Gerald B. Taylor, Jr. (TAY026)
                                          Navan Ward, Jr. (WAR062)
6                                         BEASLEY, ALLEN, CROW, METHVIN,
                                          PORTIS & MILES, P.C.
7                                         P. O. Box 4160
                                          Montgomery, Alabama 36103-4160
8                                         Telephone: (334) 269-2343
                                          Facsimile: (334) 954-7555
9
                                          ATTORNEYS FOR PLAINTIFF
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT